# In the United States Court of Federal Claims

MARC HOWARD,

        *Petitioner*,

v.

THE UNITED STATES,

        *Respondent*.

No. 16-1592V
(Filed: May 18, 2023)*

*Milton Clay Ragsdale*, Ragsdale LLC, Birmingham, AL, for Petitioner.

*Naseem Kourosh*, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for Respondent.

**OPINION AND ORDER**

**LERNER,** *Judge*.

    Petitioner, Marc Howard, seeks review of Chief Special Master Brian H. Corcoran's August 31, 2022 decision ("Decision"), ECF No. 71, denying the Petition for compensation, ECF No. 1. Petitioner brought this action pursuant to the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"), 42 U.S.C. § 300aa-10 *et seq.*, alleging that the tetanus-diphtheria-acellular pertussis ("Tdap") vaccine caused him to develop chronic inflammatory demyelinating polyneuropathy ("CIDP").[1] Chief Special Master Corcoran denied the Petition, finding that Petitioner failed to establish by a preponderance of the evidence that the vaccination caused his injury. Petitioner contends that the Chief Special Master's decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

    For the reasons explained below, this Court **DENIES** Petitioner's Motion for Review.

---

[1] CIDP is "a slowly progressive autoimmune neurological disorder with demyelination of the peripheral nerves and nerve roots, characterized by progressive weakness and impaired sensory function (loss of reflexes) in the limbs and enlargement of the peripheral nerves and usually by elevated protein in the cerebrospinal fluid." *Chronic inflammatory demyelinating polyneuropathy (CIDP)*, *Mosby's Medical Dictionary* (10th ed. 2017).

* Pursuant to Vaccine Rule 18(b), this opinion was initially filed on February 27, 2023, and the parties were afforded 14 days to propose redactions. The parties did not propose any redactions. Accordingly, this opinion is reissued in its original form for publication.

**I.      Factual and Procedural Background**[2]

On January 15, 2014, Mr. Howard visited an urgent care center complaining of chest congestion, a productive cough, and chills. *Howard v. Sec'y of Health & Hum. Servs.*, No. 16-1592V, 2022 WL 4869354, at *1 (Fed. Cl. Spec. Mstr. Aug. 31, 2022) (citing Pet'r's Ex. 59 at 5, 8, ECF No. 40-1). Doctors at the clinic diagnosed him with bronchitis. His medical history at the time included high blood pressure, asthma, bronchospasm, and mild obstructive lung disease. *Id.* (citing Pet'r's Ex. 3 ("Daphne Med. Rec.") at 22, 32, 34, 52, ECF No. 6-1).

On February 14, 2014, Mr. Howard visited Dr. Laura Hollensworth for transition of care. Daphne Med. Rec. at 7. Dr. Hollensworth observed coughing, wheezing, chest pain, asthma, and left knee pain, but no neurologic or neuropathic disorders. *Howard*, 2022 WL 4869354 at *1 (citing Daphne Med. Rec. at 7–8). During this visit, Mr. Howard received the Tdap vaccine. *Id.* (citing Daphne Med. Rec. at 8). He did not immediately experience any adverse reactions to the vaccine, and "almost three weeks passed before [he] sought care again." *Id.* at *2.

On March 4, 2014, Mr. Howard visited Dr. Hollensworth complaining of pain in his neck and "tingling, burning, and numbness" in his feet. *Id.* (citing Daphne Med. Rec. at 4). He indicated that his son was suffering from strep throat, but Mr. Howard's strep and rapid flu tests returned negative. *Id.* (citing Daphne Med. Rec. at 4–5). Dr. Hollensworth noted that he was wheezing and had elevated blood pressure and back pain, but that he had no fever, normal breathing on auscultation, and normal cranial nerve and motor functioning. *Id.* (citing Daphne Med. Rec. at 4–5). Dr. Hollensworth diagnosed him with flu-like symptoms, cervicalgia, elevated blood pressure, and asthma. *Id.* (citing Daphne Med. Rec. at 4–6). The doctor treated him with an anti-inflammatory drug and a steroid injection and advised him to go to the emergency room if his symptoms worsened. *Id.* (citing Daphne Med. Rec. at 6).

On March 5, 2014, Mr. Howard went to urgent care complaining of numbness, tingling, and swelling in his extremities. *Id.* at *2 (citing Pet'r's Ex. 4 ("Urgent Care Med. Rec.") at 3, ECF No. 6-2). He further indicated that the first two symptoms began on March 1, 2014—sixteen days after he received the Tdap vaccination. *Id.* (citing Urgent Care Med. Rec. at 2). The urgent care doctor diagnosed him with peripheral neuropathy and advised him to pursue specialized neurologic care. *Id.* (citing Urgent Care Med. Rec. at 4).

On March 6, 2014, Mr. Howard went to the emergency room four days after symptoms in his right foot progressed to his left foot and fingertips. *Id.* (citing Pet'r's Ex. 7 ("Thomas Hosp. Med. Rec.") at 821). His physical, cranial, and motor exam results were normal. *Id.* (citing Thomas Hosp. Med. Rec. at 822). He was admitted to the hospital and diagnosed with peripheral neuropathy. *Id.* (citing Thomas Hosp. Med. Rec. at 818). Mr. Howard was discharged later that day. *Id.* (citing Thomas Hosp. Med. Rec. at 818).

---

[2] For the purpose of resolving the pending motion for review, the Court summarizes the facts as presented in the Chief Special Master's Decision and does not make independent findings of fact.

On March 7, 2014, Mr. Howard visited Dr. Andrew Dukes, his primary care physician, complaining of numbness and weakness in his extremities. *Id.* (citing Pet'r's Ex. 6 ("Dr. Dukes Part I Med. Rec.") at 5). Upon examination, Dr. Dukes believed that his symptoms could "possibly represent" Guillain-Barré syndrome ("GBS").[3] Thomas Hosp. Med. Rec. at 575. Dr. Dukes referred him to Dr. Abdel Kasmia, a neurologist, who evaluated him that same day. *Howard*, 2022 WL 4869354, at *2 (citing Dr. Dukes Part I Med. Rec. at 6–7). Dr. Kasmia agreed with Dr. Dukes and postulated that Mr. Howard was suffering from the acute inflammatory demyelinating polyneuropathy ("AIDP") variant of GBS. *Id.*; Dr. Dukes Part I Med. Rec. at 6–7; Thomas Hosp. Med. Rec. at 575. Dr. Dukes and Dr. Kasmia agreed that he should be admitted to the hospital for further evaluation and testing. *Howard*, 2022 WL 4869354, at *2; Dr. Dukes Part I Med. Rec. at 7; Thomas Hosp. Med. Rec. at 572. Following a series of neurological tests, Dr. Kasmia diagnosed Mr. Howard with GBS. *Howard*, 2022 WL 4869354, at *2 (Thomas Hosp. Med. Rec. at 571, 573, 575). On March 17, 2014, he was discharged from the hospital and was directed to participate in outpatient rehabilitation. *Id.* (citing Thomas Hosp. Med. Rec. at 575).

Mr. Howard visited Dr. Dukes again on April 21, 2014. *Howard*, 2022 WL 4869354 at *3 (citing Dr. Dukes Part I Med. Rec. at 15). He reported that, although he was attending physical therapy and taking his prescribed medications, he noticed no substantial increase in strength. *Id.* In a follow-up visit on May 12, 2014, he complained of a numb throat and difficulty swallowing. *Id.* (citing Dr. Dukes Part I Med. Rec. at 20). Dr. Dukes referred him to the University of South Alabama, Department of Neurology for a neuromuscular evaluation. Pet'r's Ex. 5 ("Dr. Bassam Part I Med. Rec.") at 7; Dr. Dukes Part I Med. Rec. at 22.

On May 3, 2014, Mr. Howard reported to the emergency room complaining of "dizziness, weakness, and a drop in blood pressure after taking Zanaflex, a muscle relaxant." Thomas Hosp. Med. Rec. at 262). He was admitted to the hospital and diagnosed with an adverse drug reaction. *Id.* at 265. During this hospital admission, Mr. Howard reported developing GBS after receiving a whooping cough vaccination. *Id.* at 266–268. He was discharged from the hospital the next day. *Id.* at 279.

On May 15, 2014, Mr. Howard saw Dr. Bassam A. Bassam, a neurologist at the University of South Alabama. Dr. Bassam Part I Med. Rec. at 7. During this visit, Mr. Howard reported that he received a whooping cough vaccination three weeks prior to the onset of his symptoms. *Id.* at 7. Dr. Bassam conducted an EMG examination that revealed "severe primary demyelinating peripheral polyneuropathy, with associated extensive axonal loss." *Id.* at 10. Dr. Bassam thus concluded that he "most likely" suffered from CIDP "despite an acute onset."

---

[3] GBS is "an idiopathic, peripheral polyneuritis that may occur 1 to 3 weeks after a mild episode of fever associated with a viral infection or with immunization but that can also occur with no preceding illness. Symmetric pain and weakness affect the extremities, and paralysis may develop. The neuritis may spread to the trunk and face. Symptoms vary in intensity from mild to severe enough to require critical nursing care, including ventilator assistance." *Guillain-Barré syndrome*, *Mosby's Medical Dictionary* (10th ed. 2017).

*Id.* at 8.  He recommended Mr. Howard receive intravenous immunoglobulin treatment ("IVIG") and continue physical therapy.  *Id.*

On December 19, 2014, Mr. Howard returned to Dr. Bassam for further treatment.  *Id.* at 5.  Dr. Bassam noted that he was receiving an IVIG course every four weeks and had "regained his strength and ability to ambulate."  *Id.* at 4.  Dr. Bassam formally diagnosed him with CIDP and noted that Mr. Howard responded well to IVIG therapy.  *Id.*  Accordingly, Dr. Bassam recommended he continue IVIG treatment at a reduced dosage.  *Id.* at 5.

On November 30, 2016, Petitioner filed a timely petition for compensation with Respondent, the Secretary of Health and Human Services, alleging that he developed GBS and/or CIDP as a result of the vaccine.  Pet., ECF No. 1.  Petitioner subsequently amended his claim to assert only that his CIDP was vaccine-caused.  Pet'r's Pre-Hearing Br. at 3, ECF No. 61 ("[The] primary dispute is whether the Tdap vaccine caused Mr. Howard's acute CIDP.").  On August 31, 2022, Chief Special Master Corcoran denied Petitioner's entitlement because "Petitioner ha[d] not preponderantly established that the Tdap vaccine can cause CIDP, or did so specifically to him."  *Howard*, 2022 WL 4869354, at *1.

On September 30, 2022, Petitioner filed a motion for review of the Chief Special Master's decision.  Pet'r's Mot. for Rev. at 1, ECF No. 72.  He asks this Court to set aside the Chief Special Master's findings of fact and conclusions of law as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  *Id.*  In the alternative, Petitioner asks this Court to remand the case to the Chief Special Master.  *Id.*  Petitioner claims the Chief Special Master should have applied a plausibility standard when examining Mr. Howard's medical theory and inappropriately rejected evidence demonstrating a causal link.  Memo. in Supp. of Mot. ("Mot.") at 1, ECF No. 72-1.

**II.     Jurisdiction and Standard of Review**

This Court possesses jurisdiction, pursuant to the Vaccine Act, to:

> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
>
> (B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or
>
> (C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(2).

When reviewing a special master's decision, the Court of Federal Claims examines findings of fact according to an arbitrary and capricious standard.  *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 869–71, n.10 (Fed. Cir. 1992) (stating that "the only time" a court "can make its own findings of fact" is when a special master was arbitrary and capricious, and "it

is necessary to substitute [the court's] own findings of fact"); *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011) ("We do not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder."). A reviewing court scrutinizes all legal conclusions de novo. *E.g.*, *Sharpe v. Sec'y of Health & Hum. Servs.*, 964 F.3d 1072, 1077 (Fed. Cir. 2020).

A petitioner may establish that a vaccine caused an alleged injury in one of two ways. First, a petitioner benefits from a "statutorily-prescribed presumption of causation" if their injuries and vaccination records align with the Vaccine Injury Table at 42 U.S.C. § 300aa-14. *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005) (describing a "[t]able injury"). CIDP is not a table injury for any vaccine. 42 U.S.C. § 300aa-14(a). If an injury is off-table, a petitioner must "prove by a preponderance of the evidence" that a particular vaccine caused the alleged injury. *Althen*, 418 F.3d at 1278. To do this, a petitioner "must show: (1) a medical theory causally linking the vaccine and the injury; (2) a logical sequence of cause and effect showing the vaccine was the reason for the injury; and (3) a proximate temporal relationship between vaccination and injury." *Sanchez v. Sec'y of Health & Hum. Servs.*, 34 F.4th 1350, 1353 (Fed. Cir. 2022) (citing *Althen*, 418 F.3d at 1278).

### III. Discussion

#### A. The Chief Special Master Applied the Appropriate Burden of Proof.

The standard for medical proof is preponderance—not plausibility. The statute is clear in this regard. 42 U.S.C. § 300aa-13(a)(1)(A) ("Compensation shall be awarded . . . if . . . the petitioner has demonstrated by a *preponderance* of the evidence the matters required in the petition." (emphasis added)). In interpreting the statute, the Federal Circuit has consistently and unequivocally applied a preponderance standard. *See, e.g.*, *Whitecotton v. Sec'y of Health & Hum. Servs.*, 81 F.3d 1099, 1102 (Fed. Cir. 1996); *Orloski v. Sec'y of Health & Hum. Servs.*, 839 F. App'x 538, 542 (Fed. Cir. 2021). While the Federal Circuit adjusted pleading standards in *Althen*, the evidentiary standard remained unchanged and applied to all three *Althen* prongs. *See* 418 F.3d at 1278 ("[The] burden is to show by preponderant evidence that the vaccination brought about injury."); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019) ("We have consistently . . . reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." (citation omitted)); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010) ("[P]roof of a 'plausible' or 'possible' causal link between the vaccine and the injury . . . is not the statutory standard. . . . [T]he applicable level of proof is . . . 'preponderant evidence.'"); *Oliver v. Sec'y of Health & Hum. Servs.*, 900 F.3d 1357, 1361 (Fed. Cir. 2018) ("Where . . . a petitioner alleges an injury not found on the Vaccine Injury Table . . . [his] burden is to show by preponderant evidence each of the requirements set forth in *Althen*." (citation and quotation marks omitted)); *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1350 (Fed. Cir. 2010) ("[T]he . . . question is whether [petitioner] provided proof by a preponderance of the evidence of a medical theory.").

According to Petitioner, the standard before *Moberly* was plausibility, and *Moberly* alone precipitated a move towards preponderance. Mot. at 11–12 (citing *Moberly*, 592 F.3d at 1322). Petitioner cites a procedural rule that *Moberly* could not "overturn prior precedents of the Circuit

5

[because] only an *en banc* ruling [could] accomplish that." Mot. at 11. As such, Petitioner believes the pre-*Moberly* plausibility standard is still in effect. This is incorrect.

*En banc* procedure aside, Petitioner's characterization of the pre-*Moberly* standard is contrary to precedent. The case law reveals consistency, not change. The standard has been preponderance for nearly four decades. *E.g.*, *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1371 (Fed. Cir. 2000) (pre-*Moberly*) ("[Petitioners] did not establish by a preponderance of evidence."); *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991) (pre-*Moberly*) ("The standard of proof required by the Act is simple preponderance of evidence." (citations omitted)); *Walther v. Sec'y of Health & Hum. Servs.*, 485 F.3d 1146, 1151 (Fed. Cir. 2007) (pre-*Moberly*) ("Once petitioners satisfy their burden of proving presumptive or actual causation by a preponderance of evidence, they are entitled to recover." (quoting *Whitecotton v. Secretary of Health & Human Services*, 17 F.3d 374, 376 (Fed.Cir.1994), *rev'd on other grounds sub nom.*, *Shalala v. Whitecotton*, 514 U.S. 268 (1995)); *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009) (pre-*Moberly*) ("[T]he function of a special master is . . . to determine . . . 'whether it has been shown by a preponderance of the evidence that a vaccine caused the [petitioner's] injury.'" (quoting *Knudsen v. Sec'y of Health & Hum. Servs.,* 35 F.3d 543, 549 (Fed. Cir. 1994)); *Whitecotton*, 81 F.3d at 1102 (pre-*Moberly*) ("If petitioner can show to a preponderance that the vaccine was the cause of her injuries, then she is entitled to compensation under the Act.").

Since *Moberly*, the Federal Circuit has continued to apply a preponderance standard. *E.g.*, *Kottenstette v. Sec'y of Health & Hum. Servs.*, 861 F. App'x 433, 439 (Fed. Cir. 2021) (post-*Moberly*) ("Petitioners seeking compensation under the Vaccine Act must prove by a preponderance of the evidence that a covered vaccine was a cause of the injury they claim."); *Lozano v. Sec'y of Health & Hum. Servs.*, 958 F.3d 1363, 1368 (Fed. Cir. 2020) (post-*Moberly*) ("It is undisputed that [petitioner's] injury is in the off-Table category, meaning that she must prove 'actual causation' or 'causation in fact' by preponderant evidence."); *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (post-*Moberly*) ("[T]he statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged."); *Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1379 (Fed. Cir. 2015) (post-*Moberly*) ("A petitioner seeking compensation under the Vaccine Act must establish, by a preponderance of the evidence, that a covered vaccine caused the claimed injury."); *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011) (post-*Moberly*) ("A petitioner seeking compensation under the Vaccine Act must prove by a preponderance of the evidence that the injury at issue was caused by a vaccine."); *Olson v. Sec'y of Health & Hum. Servs.*, 758 F. App'x 919, 922 (Fed. Cir. 2018) (post-*Moberly*) ("[T]he petitioner's 'burden is to show by preponderant evidence' each of the requirements set forth in *Althen*." (citation omitted) (quoting *Oliver*, 900 F.3d at 1361)); *Orloski*, 839 F. App'x at 542 (post-*Moberly*) ("[T]he Special Master's conclusion that [petitioner] failed to prove the first *Althen* prong . . . by preponderance of the evidence is supported by the evidentiary record.").

Notably, Petitioner misquotes *Lampe* in support of his argument that "[t]he standard for articulating a medical theory in expert testimony . . . is 'medical plausibility.'" Mot. at 12 (misquoting *Lampe*, 219 F.3d at 1368). *Lampe* never establishes plausibility as the standard, nor does it mention "medical plausibility." Instead, it reasserts what the statute, the Federal Circuit,

and the Court of Federal Claims have held for nearly forty years: the standard is "preponderance of the evidence." *Lampe*, 219 F.3d at 1359, 1360.

Petitioner also misconstrues *Kottenstette*, 861 F. App'x at 437. Mot. at 13. There, the Federal Circuit ruled that a special master need not require proof of a specific biological mechanism for *Althen* prong one. *Id.* at 440–41. Petitioner reads this too broadly. *Kottenstette* did not dilute the preponderance standard. On the contrary, *Kottenstette* is one voice among many standing for precisely the same proposition: "*Althen* lists three prongs which petitioners must prove by preponderant evidence." *Id.* at 437. The only references to plausibility throughout the decision are direct quotes from the decisions below. Its ruling made no mention of plausibility and, instead, hinged on whether "sufficient evidence" weighed in favor of preponderance. *Id.* at 442–43 ("We find that these factual findings by the first special master provide sufficient evidence.").

### B. The Chief Special Master Appropriately Applied the *Althen* Prongs.

The Chief Special Master applied the appropriate standard in the appropriate manner. Mr. Howard's petition failed for two reasons: (1) his medical theory under the first *Althen* prong was insufficiently specific to CIDP, and (2) the logical sequence of cause-and-effect fell short of the requisite causal link under the second *Althen* prong.

#### 1. First *Althen* Prong: Medical Theory

The Chief Special Master evaluated the evidence presented and found it lacking in both quality and quantity. *See, e.g.*, Dec. at 33 ("[T]here is a foundational weakness in Petitioner's causation theory."); 34 (finding Petitioner "succeeded only partially" in providing relevant evidence), ("[L]ittle to no other affirmative evidence was offered linking the vaccine to CIDP."), ("The mechanisms proposed . . . were also incompletely established, and ultimately did not add up to reliable and preponderant evidence."); 35 ("[D]etails necessary to flesh out this aspect of [Petitioner's expert's] theory were missing."), (finding Petitioner's expert "assumed [a certain proposed process] would occur" (emphasis omitted)), (finding Petitioner's expert "only cursorily mentioned, with far less substantiation" "other proposed mechanisms"), (finding that an article offered by petitioner's expert to support a proposed mechanism "says nothing about vaccines"); 36 (finding petitioner "could not offer enough proof specific to CIDP"). Petitioner faults the decision below for its purported search for scientific confirmation and unlawful application of collateral estoppel. Both arguments fail.

The Chief Special Master did not reject circumstantial evidence as Petitioner alleges. Mot. at 1, 7–9. Nor did he require "direct proof and confirmation." *Id.* at 1, 6–9. The Decision grappled with the quality and quantity of the evidence—not its circumstantiality—and found both metrics lacking. *See, e.g.*, Dec. at 33. Chief Special Master Corcoran was correct not to apply research on GBS to CIDP. While the two diseases are similar, Mot. at 6, mere synonymity is not enough to graft a medical theory linking the Tdap vaccine to GBS onto this case. *Sanchez*, 2022 WL 1013264, at *21–24; *Houston v. Sec'y of Health & Hum. Servs.*, No. 18-420V, 2021 WL 4259012, at *10 (Fed. Cl. Spec. Mstr. Aug. 19, 2021). Salient distinctions between the two (e.g., neuropathic processes driven by different antibodies, "course lengths, treatments, and some symptoms") informed his reluctance to do so. Dec. at 32. His choice to limit the applicability of

GBS research to CIDP was part-and-parcel to factfinding under the first *Althen* prong. Despite assertions to the contrary, this approach was not arbitrary.

Petitioner also misreads the Chief Special Master's consideration of previous cases involving CIDP. While Mr. Howard is correct that the Vaccine Program bars special masters from applying collateral estoppel, *see, e.g.*, *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 629–30 (1998), the Chief Special Master did no such thing. The Decision certainly considered previous cases involving CIDP. Dec. at 29–32. However, that consideration had no preclusive effect on Petitioner. He was still permitted to raise his CIDP claim. The Chief Special Master cabined his consideration to "tak[ing] into account, for guidance, the logic of reasoned entitlement determinations." *Id.* at 29 n.13; *Chambers v. Sec'y of Health & Hum. Servs.*, No. 19-140V, 2022 WL 3369332, at *25 n.25 (Fed. Cl. July 22, 2022) ("It is therefore reasonable to review similar determinations involving comparable facts and theories. Indeed, given the 'inquisitorial' nature of the special master function, it would be remiss for a special master not to look at how the same fact pattern and/or argument has been treated in prior decisions." (citing *Hanlon*, 40 Fed. Cl. at 630)). The Decision relied on the evidence—or lack thereof—presented in this case. Dec. at 33–36.

### 2. Second *Althen* Prong: Logical Sequence of Cause-and-Effect

Failure on the first *Althen* prong renders analysis under the second unnecessary. Thus, criticism thereof has no bearing on the outcome of the entitlement determination so long as denial under the first prong was soundly reasoned. *See, e.g.*, *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1358 (Fed. Cir. 2013). Finding that the Decision thoughtfully rejected Petitioner's medical theory, the rest is extraneous. Even so, the entitlement determination went above-and-beyond and turned to the second prong. As such, this Court evaluates the Chief Special Master's further analysis to note, briefly, that it too passes muster.

The Chief Special Master examined the evidence to probe a causal link between the Tdap vaccine and Mr. Howard's CIDP. Nothing in his examination suggests his Decision was arbitrary or otherwise not in accordance with law. On the contrary, the Decision thoroughly addressed what little evidence Petitioner presented for the second prong.

For instance, Mr. Howard challenges the consideration of a previous bout with bronchitis as an alternate cause of CIDP. Mot. at 16–19. He contends that the gravamen of the Decision was a finding in favor of an idiopathic pathology in lieu of Petitioner's alleged cause. Mot. at 18. The statute provides that petitioners cannot prevail if the injury is due to "factors unrelated" to the vaccination. 42 U.S.C. § 300aa-13(a)(2). "Factors unrelated" does not include "idiopathic" causes. *Id.* Certainly, the Decision erred when it labeled the bronchitis infection an "idiopathic-in-origin illness." Dec. at 37. However, inartful phrasing did not shift the burden as Petitioner argues.

Neither statute nor precedent obliged the Chief Special Master to disregard Respondent's experts. "The [G]overnment, like any defendant, is permitted to offer evidence to demonstrate the inadequacy of the petitioner's evidence on a requisite element of the petitioner's case-in-chief." *De Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1353 (Fed. Cir. 2008). The Act shifts the burden to prove an alternate cause to Respondent if—and only if—Petitioner

8

makes a prima facie case of vaccine-caused injury. *See, e.g.*, *Knudsen*, 35 F.3d at 549; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575. Respondent was not required to prove an alternate cause (idiopathic or otherwise) because Petitioner's prima facie case came to naught. Respondent merely demonstrated the inadequacy of the effort to undercut alternate causes. *See De Bazan*, 539 F.3d at 1353; *Doe 11 v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349, 1358 (Fed. Cir. 2010) ("[W]hen petitioners attempt to eliminate other possible causes to buttress their theory of causation, the special master should evaluate such evidence in determining whether a prima facie case has been established.").

Finally, Petitioner quarrels with the "two factual criteria" required by the Chief Special Master. Mot. at 19. The Decision observed the lack of evidence indicating the presence of particular antibodies, Dec. at 33, and the immediacy of reaction, Dec. at 36. Notation of absence is not the requirement of presence. The Decision emphasized the absence of preponderant evidence to show cause-and-effect, in the form of an "immediate reaction" or "transient symptoms" indicating an "aberrant immune response." Dec. at 36–37. Part of this analysis stemmed from Petitioner's own acknowledgement that the "test for specific causation is the correspondence between the general causation theory postulated and the medical facts of a petitioner's clinical course." Mot. at 19. Because Petitioner's theory relied on the pathogenetic role of certain antibodies, Petitioner cannot then fault the Decision for noting the absence of evidence preponderantly indicating their presence.

Chief Special Master Corcoran analyzed the second prong in accordance with the Vaccine Act. As such, there is no reason to disturb the decision below.

## IV.    Conclusion

Petitioner unsuccessfully casts the Decision as arbitrary and not in accordance with law. On the contrary, the Chief Special Master applied the correct legal standard and carefully weighed the evidence. The Court **DENIES** Petitioner's Motion for Review and **SUSTAINS** the Chief Special Master's Decision. The Clerk of the Court shall enter judgment for Respondent.

**IT IS SO ORDERED.**

s/Carolyn N. Lerner<br>
Carolyn N. Lerner<br>
Judge